And we'll start this morning with United States v. Kupaluyi, 16-1008. Morning, Your Honor. Mr. McLaughlin. Thank you, Your Honor. Again, Devin McLaughlin for Mr. Kupaluyi. As the Court is aware, we've challenged a number of the sentencing enhancements imposed by Judge McAvoy. I wanted to start with the 2B1.1B11 enhancement, if I could. The one thing that the government and defendant are in agreement on is that the finding that this was possession of an authentication feature was erroneous. That's off the table. So next argument advanced by the government for trying to go ahead and apply this enhancement has to do with production of an access device, arguing that the bank account numbers on the carpet checks constitute production of an access device. There are two problems with that argument, Your Honor. One is that Judge McAvoy went ahead, because he wholesalely adopted the pre-sentence report, found that there was no production that could be traced back to my client. The second and bigger legal issue is that these were on checks, and checks, paper instruments, are specifically excluded from the definition of access device. But we need to reach the legal issue, because one of the things that I was struck by is that the pre-sentence report, that the first draft of the pre-sentence report had utilized the same section with a somewhat different theory. And as I read the amended pre-sentence report, it withdrew that theory on the ground that there was no evidence that Mr. Kupaluye had engaged in the production. Correct. So your position is that finding, which is adopted wholesale, not specifically, but the PSR is adopted by Judge McAvoy, would apply to this theory as well. Right. Absent that being, there's two aspects of that legal ground. One, production. Two, access device. And there's a finding that there's no production. Absent that being clear error, you don't even get to the second issue. The second issue in terms of whether the paper check constitutes an access device, the government agrees that the paper check itself can't be an access device, but says that the account number on it is an access device. And therefore, that takes it out of the exclusion. Our position on that, frankly, is that, and this goes to everything related to the carpet checks, there was fraud perpetrated with regard to the window and door place, which was through wire transfers, and that's what he pled guilty to, and that's what he was primarily sentenced for. They then end up finding this batch of checks in his apartment. There was never any fraud perpetrated with those checks. And so it really ends up bringing us in many aspects of this into speculation as to what those checks were for. The government says, well, we can infer that they were going to use the account number for a wire transfer, but, A, that never happened, and, B, they're on the face of checks. And he says, well, we can do it because they used wire transfer with regard to the door and window place, but the door and window place, there were never any checks. So in terms of comparing those two, from our position, it's apples and oranges. And, again, just to be clear, you're not contesting that it could be inferred that those checks were intended to be used in some kind of fraud, given the context here, but the point is for this enhancement to apply, there would have to, particularly on the government's theory, there would have to be some kind of finding, not only that they were to be used, the checks were to be used somehow in a fraudulent manner, but that the account number on the check was going to be used for a wire transfer, specifically because otherwise, even on the government's, even the government agrees it wouldn't be. Right. Okay. Yes, and better articulated than I could, Your Honor. So that's our position vis-a-vis that theory of the government. So then we get to the third theory of the government, which is that the use of KY's means of identification to open the synchrony bank accounts fell within the next section under 11. Right. An unauthorized transfer. So this gets to the unauthorized issue. And from our perspective, I mean, I think it's an easy hypothetical. If an individual authorizes somebody to open a bank account for them, which is what the factual predicate was here, and then the defendant individual who has opened the account uses it in a fraudulent manner, in a manner beyond what the person thought they were going to do, we don't think, I don't think that goes ahead and fits within this enhancement, Your Honors. That unauthorized use, that fraudulent unauthorized use, that's the underlying conduct. That's the offense. That's why you get the base level. This enhancement is supposed to add to that by saying you did something else unauthorized. You went ahead and took a means of identification and created something else. Here, KY specifically authorized, and this is in the PSI, open these bank accounts. So they did open the bank accounts. The fact that they were fraudulently used. They authorized it under completely fraudulent circumstances. And so, you know, my father goes ahead and says, Devin, open these bank accounts. I go ahead and open these bank accounts intending to defraud him. He's authorized me to open those bank accounts. My defrauding him, that's the base offense. Whether an enhancement should get added, there are tons of situations where people go ahead and use somebody's ID to create another ID. There could be a situation, just to I think address your hypo, where someone legitimately, a defendant legitimately, does not engage initially in a fraud and gets the authorization and thereafter does whatever to engage in fraud. This is a different situation. As I understand it, the situation is that the fraud was in existence at the inception. So in my hypothetical, I'm the really bad son. I intended to defraud him right from the get-go. You know, I got his permission to go ahead and do this right from the get-go. And I submit, Your Honor, that doesn't make this enhancement apply. It does make my conduct fraudulent. But in terms of if he says yes, Devin, open these bank accounts. How do you read authorized? How do you interpret that word? Authorized in this context is use my name, social security number, whatever you need to do, and open an account in this bank. I am authorizing you to do that. I think for X purpose, you're doing it for Y purpose. Your answer really is what is unauthorized. And if it's taken without your knowledge and without your approval, then it's used in an unauthorized way. Right. But you're saying the authority of authorization only goes as you focus on whether the numbers or the accounts were authorized. You don't look at the purpose. Correct. And I don't think the test looks at the purpose. Because what you're saying is that we've got a crime, this fraud. This is supposed to be conduct that makes the fraud worse. Right. And the thing that makes the fraud worse, in the words of the guideline, is using one means of identification without authority to create another means of identification. And here you're saying that the use of the first means of identification to create the bank account that is somewhat peculiarly, but under the definition, a means of identification, that conduct was specifically authorized. Right. And so this is not the same case and is not as bad as a case in which I steal your checks, let's say, like the carpet company's checks, and then use those checks to get a driver's license or something in the same name, thus creating or open a new bank account, thus creating a new means of identification. Right. And that's the norm. That's what we usually see. That happens all the time. That gets you the extra two points here. Did you make this argument at sentencing? I didn't have the pleasure of being at sentencing, but that said. So at sentencing, which ends up going to the plain error issue, the easy answer is no, because this wasn't addressed at sentencing. At sentencing, as you can recall, the original PSR said production of access device, and that's all it said. Objection by defense saying, wait a second, there's not sufficient evidence of production. Then there was an addendum to the PSI, which ended up saying, making these two arguments in the addendum. But when we got to the sentencing argument, there was no discussion of any of this. The issue really had to do with is this an authentication device and was it knowingly possessed, and that's what the defense talked about and that's what the government talked about. I mean, in other words, the issue here is that the actual thing that the judge found, which again is just a blanket after all this discussion, the judge just says, I adopt the PSR. What's in the PSR, not in the addendum where they talk about other possible theories, but the actual guideline calculation that the judge addressed, adopted, used a different theory that you've already talked about. The authentication one. The authentication one. That the government now agrees is wrong. And the government is now adopting this theory, I call it the C1 theory that you're now talking about, as something that we should say, the fact that the judge was clearly wrong in the adjustment that he applied is not plain error because we should find this other one is so clearly adopted. It's a convoluted use and frankly a stretch use from our perspective of plain error where my defendant and the attorney representing him obviously objected to the enhancement, objected to the only enhancement that was on the face of the PSI, never had an argument about this by either side, so that's the status of it. Your answer to Judge Lillier's question is actually no, we didn't raise this argument against C1 because C1 wasn't in play at all in the discussion before the judge. In the first place, the defendant was focused on what was the theory in, actually everybody seemed to be focused on the theory that was already withdrawn, that was in the original PSR, but the one that the judge adopted is version 2 of the PSR, we think. All of it shows you how messy plain error is in this. Your Honor, I'm over my time on this and I have a reserve rebuttal, so I will address that. Thanks. May I please the court? I don't think you can just dismiss the addendum here. The addendum clearly states that alternate grounds for finding this enhancement was the use of a means of medication to create another one, so that was definitely in play. It's true that it wasn't discussed at sentencing, but that's partly also because the defense counsel never raised the issue. But it's also an alternative theory addressed in an addendum that explains why the probation department has withdrawn the theory that was in the original pre-sentence report, right? Yes. And the amended pre-sentence report has a calculation, a new calculation, and it explains why the probation department is applying this enhancement, and it doesn't use the C1 theory. It uses the A2 theory that we now all agree is wrong anyway. Well, I think the addendum talks about the access device, not an authentication feature. So it agrees with the defendant that he may not have had possession over the checks, but it does talk about the access device as a possible grounds. And again, I think when the judge says, you know, I find the information in the PSR, he says exactly the total offense level based on the information in the pre-sentence report, which I'm going to find accurate by a preponderance of the evidence, makes the offense level 20. Do we even know what pre-sentence report he's talking about? Because I would automatically assume that he's talking about the one that is then operative, the amended one, but all the discussion by both parties and by the judge seemed to be focused on the theory that was advanced in the original pre-sentence report and withdrawn in the amended one. Well, I think when the judge raises the issue about the enhancement, he says, what about the unauthorized access device enhancement? What do you say about that? I think there might be a confusion with the authentication feature and there's basically three grounds at play here. And so he's going to the second one, the one that the PSR, you're right, the PSR does take the access device thing off the table and provides the authentication feature as the second basis and then a third basis being in the addendum for the, actually both are in the addendum, the third basis being the means of identification. It's true that we don't know, he didn't say I'm adopting the PSR with the addendum, but that addendum was disclosed to the parties eight days in advance. And yet neither the prosecutor nor the defense attorney referred to it and they both argue as if they are arguing about not the addendum, not even the amended pre-sentence report, but the original pre-sentence report. I'm just wondering, is there any reason why we shouldn't just send this back to Judge McAvoy and ask him to explain what, if anything, he thought he was adopting? We wouldn't oppose that, Your Honor. It's just, I think as a practical matter, Mr. Kupaluye gets out in October, so this would have to be done fairly quickly, expeditedly. So we wouldn't, I think, oppose further explanation. I think the record could be clearer on this. But I do think, again, our argument is that plain error would apply because both sides have an obligation to raise this issue. And the defense counsel really signaled, and this is maybe an effect of Booker, he signals very quickly when they're talking about this, he says, frankly, I'm less concerned with the means of how we get to the particular sentence than the end result, and then immediately talks about a variance. So it's almost like he's signaling, I don't really want to get into the nitty-gritty here. We're kind of dancing on the head of a pin, so let's talk about the real issue. And yet the judge seems to have, the fairest inference would be, wouldn't it, that the judge was giving a guideline sentence and that the guidelines had a big impact on it? Oh, yes. It was at the bottom of the range. It was within the range and at the bottom. If I could, and in my time, address the mitigating role, I'm sorry, the sophisticated means enhancement, I do think that that falls directly in the kind of the plain text of the guideline, which says that, in the commentary, it says, sophisticated means includes conduct such as hiding assets, ellipses, through the use of ellipses, offshore accounts, financial accounts. And this is exactly what he did. If the question is more kind of an ought question, should this apply, I think you look to the intent of the guidelines in the amendment that we're kind of talking about. And that amendment didn't raise the bar as to what sophisticated means. It just said you have to be directly involved, and we have that here. And, again, the intent was to make sure that the most or the least culpable people were not being tagged with this. And he's, by no stretch of the imagination, I think, least culpable. He was handling this money, large sums of money. He was sending it overseas to accounts in Nigeria. He was taking money for himself, over $30,000 for himself. He was in charge of a large sum of money. So for the very same reasons that the mitigating role adjustment doesn't apply, I think you can't say he's the less culpable. And this is something also that was not objected to at the time, so a plain error standard applies to these other two enhancements as well? I think for this one, I think there was an objection. They did discuss this. So I think we're under a de novo standard here. Well, in that case, could you just articulate for me exactly what distinguishes Mr. Kupaluye from the scenario that we see fairly commonly where some fraudster devises a very complicated scheme to steal identities and open credit cards and order merchandise all over the place, and some housewife is recruited to accept the package, knowing that it's a fraud, not knowing anything about how the fraud is calculated, and in effect turns over the proceeds back to the fraudsters. I think Mr. McLaughlin's argument is that's Kupaluye. He just sits there in Binghamton while other people devise all of this, and he doesn't just get a package of merchandise and hand it to someone. Granted, he gets proceeds in a bank account, which he then transfers abroad, but I think the argument is it's the same thing. Why is it not the same thing? I think this does then get to the idea that the knowledge of the person is important. Perhaps I think there's no suggestion in the amendment that knowledge is off the table, and it's relevant here because he's opened up his Binghamton accounts in September at the same time that the victim was being defrauded and sending money, and he was taking that money and depositing it. He understood he was found with, on his phone, a picture of the Synchrony Bank application. He's also receiving correspondence from other victims directly to him complaining about this. So he's not just some kind of a cog in the machine. He's definitely one of the primary actors here. And, yes, perhaps his individual act of signing a postal order and depositing it isn't an intricate in itself act, but his knowledge of the entire scheme and how it works with these Synchrony accounts, which are also taking money from a third party that has no idea, shoveling it to KY, KY then sends it to him, and he puts it in his own bank account and then sends it overseas. He knows this whole structure, and so I think that gives a meaning to what he's doing. He's trying to conceal his assets. And I think concealing assets like that... He's directly involved in this more complicated maneuver of defrauding one person, defrauding another person, and using the second person in a kind of three-cushion shot to launder or transport the funds stolen from somebody else. I don't want to overstate the case about what we know about what he was doing, but the people who are approaching KY directly, who pretended to be first the soldier in Nigeria and then later who were, I think, saying that they were Rick Bauer, that wasn't Mr. Koubaloui. But that's not terribly sophisticated either. What's sophisticated, it seems to me, or complicated are these banking arrangements and Mr. Koubaloui is involved in that. He knows the structure. There's evidence linking him to knowledge of the way the Sincroni bank accounts were being used. Again, I think if you're looking at the intent behind the application, I don't think it's the amendment. I don't think it's to try to protect people like Mr. Koubaloui. I think if you look at the examples, it's people who really were doing very small things that were necessary. Much more complicated. The scheme as a whole, which is what we're supposed to look at, was much more complicated. Yes. Thank you. Thank you, Your Honor. So I want to address the sophisticated means. I also want to address the timing and the suggestion of sending this back to Judge McAvoy because of my guy's potential release date. But anyway, on the sophisticated means, it's interesting. I listened to the government talk about what his knowledge was in terms of all this. His knowledge is specifically a factor in terms of whether he gets a minimal role adjustment. I mean, they talk about what do you know about all this stuff, and that's probably, even though I argued it, probably a pretty high bar for me to get over in terms of my third argument. But it is not what the sophisticated means amendment is about. Sophisticated means amendment is what did this guy do? I mean, that's what they're trying to get it pointed to, and the government was kind enough to concede. I don't want to overstate what this guy did because what this guy did is more along the lines of what Your Honor described. As a practical matter, you need to get one of these two-point adjustments. If you get one of these two-point adjustments off and the judge doesn't say, well, I don't care about the guidelines, I think it's a 33-month sentence anyway, that's the best you can hope for because if you got them all, it wouldn't make any difference, right, to the sentence that's relevant to his release date. He's been in for 24 months. His release date is October of 2017, according to the BOP website. If you got one two-level thing off, that would bring him down. Take it from 33 down to 27 in terms of what the minimum is. So the one thing I promised Mr. Kibouli is that his appeal wouldn't put him in a worse place, and he had a concern about that at the outset. And because of the timing of all this, it's now May. And either I get a swift defeat, which is what it is, or if Your Honors are inclined to agree with me, I would just ask you to keep in mind how to make it meaningful for him. And the one piece that we— You already have from the government more or less an acknowledgement that it's appropriate to remand this. What do you want now? I would ask the court for a remand with the substantive answer that the appropriate guidelines at most are the 27 to 33 months. Subtract one of the two enhancements and say this is what the guideline amount is, so we don't have to fight about what the guideline should be. Sentence him within it, and obviously he can— You don't have to say sentence within it. You say sentence him, right, and then he'll decide. Hopefully, based on what he said before, given his age, et cetera, he'll go on the lower end. But that would be the best way. Unfortunately, I'm not admitted in that district, so I would try to arrange to get somebody to— But what you want is for us to say substantively that one or more of these enhancements do not apply, not just to send it back to the judge to reinvestigate the facts or something like that. Of course, the problem is that might be—there might be facts that need to be found. We'll have to decide that. And is there any way in which that would make him worse off? Is the idea that if we send it back and the judge has to engage—then he's not sentenced. You get a 100-month sentence, and he's in limbo, and he'll end up spending longer than the 33 months. Well, and also he would be still in jail pending— Removal. Pending the completion of—pending sentencing, pending the completion of this case. And if that's strung out longer than a few months, he would actually be incarcerated longer. So, and thank you. In terms of what I'm asking for, I'm asking for this is what his guideline sentence is, and please resentence him within X period of time promptly or something like that. Thank you very much. Thank you.